**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-1948 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BASHAR SADIG, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The government filed this action to collect unpaid federal income taxes owed by Defendant Bashar Sadig. He owes almost $100,000, but he is basically broke. But he wasn't broke when he incurred the tax liabilities. He owned a property in the Chicagoland suburbs – a house that he renovated, before it was torn down.

After the tax bills came due, Sadig transferred the property to his (now former) wife, surrendering the property in exchange for nothing. His former wife, in turn, put the property into a trust. The government now seeks to recover the tax liabilities through a forced sale of Sadig's former property. The government basically argues that federal tax liens attached to that property before Sadig signed the quitclaim deed to his former wife.

The government moved for summary judgment. For the reasons stated below, the motion for summary judgment is granted.

### Non-Compliance with the Rules

The Court begins by calling attention to Defendant Sadig's failure to comply with the Local Rules. It is not uncommon for parties to file a response to a statement of facts that does not comply with Local Rule 56.1. But here, Sadig did not file a response at all.

The Local Rules require parties to follow a specific procedure when filing and opposing a motion for summary judgment. All litigants – including *pro se* litigants – must follow the Local Rules, or face the consequences of non-compliance. Sadig, a *pro se* litigant, is no exception.

Local Rule 56.1 governs the procedures for filing a motion for summary judgment. The moving party must file a "statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

Local Rule 56.1 also explains how to respond to a motion for summary judgment. The non-moving party must file a "response to the LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)." *See* L.R. 56.1(b)(2). That response "must consist of numbered paragraphs corresponding to the numbered paragraphs" of the movant's statement of facts. *See* L.R. 56.1(e)(1). So, by way of illustration, imagine if the movant filed a statement of material facts with 15 paragraphs. The non-movant must file a response that addresses each of those 15 paragraphs, and must do so paragraph by paragraph, one at a time.

To help *pro se* litigants, the Local Rules require parties to serve a notice that explains the procedure, so that they are not lost at sea. *See* L.R. 56.2. That way, unrepresented parties will receive clear instructions about what they need to file, and how they need to do it.

Substantial compliance with Local Rule 56.1 is not enough. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). All parties, including *pro se* litigants, must fully comply with Local Rule 56.1. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven *pro se* litigants must follow procedural rules.").

2

Compliance is necessary for the smooth running of the wheels of justice. The Local Rules are designed to give district courts the information that they need to assess whether a case deserves a trial. The uniformity of the procedure – across hundreds of cases on a district court's docket – promotes efficiency and speeds things along. It helps courts manage a pile of motions in a mountain of cases.

Consistent with the Local Rules, the government filed a statement of undisputed facts with its motion for summary judgment. *See* Pl.'s Statement of Facts (Dckt. No. 61-2). The government also served a Local Rule 56.2 Notice that explained the requirements of Local Rule 56.1. *See* Rule 56.2 Statement (Dckt. No. 61, at 3–7 of 7).

Sadig did not file a response to the government's statement of facts. Instead, he simply filed an eight-page response brief. *See* Def.'s Resp. (Dckt. No. 63). Sadig's brief devoted a few pages to the facts, under the heading "Substantive Facts." *Id.* at 5–8. Sadig basically told his side of the story, relying on a declaration that he had filed months earlier. *Id.*; *see also* Sadig Dec. (Dckt. No. 40).

That submission did not comply with the Local Rules. Local Rule 56.1 requires the non-moving party to file a supporting memo, plus a freestanding response to the movant's statement of material facts. *See* L.R. 56.1(b). Here, Sadig filed a response brief, but did not file a response to the statement of material facts. Worse yet, he did not file anything that offered a paragraph-by-paragraph, point-by-point response to the government's facts. *See* L.R. 56.1(e).

Sadig's brief did not constitute a statement of additional facts, either. Again, the Local Rules explain how the non-movant can supplement the record with additional facts. Local Rule 56.1(b) provides that if the opposing party wants to add facts, that party must file a "statement of additional material facts that complies with" Local Rule 56.1(d). *See* L.R. 56.1(b)(3). The

non-movant must attach the cited evidentiary material, too. *Id.* Simply offering additional facts in a response brief doesn't cut it. *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015) (holding a statement of additional facts "deficient" because plaintiff "failed to cite or submit evidence in support of nearly all of the additional facts he asserted"). But here, that's all Sadig did.

The punchline is that the government offered a statement of material facts, and Sadig did not respond as required by the Local Rules. So the government's facts are deemed admitted. *See* L.R. 56.1(e) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."). That outcome is not a surprise. In fact, the government sent Sadig a notice that forewarned him of the consequences of failing to comply with the rules: "If you do not respond to a fact asserted by the defendant, the judge may decide that you have admitted that the fact is true." *See* L.R. 56.2.

The Court thus accepts as undisputed the facts put forward (and properly supported) by the government. *See Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.").

That said, Sadig's failure to respond does not mean that the government must prevail on its motion for summary judgment. The material facts are undisputed, but as the movant, the

government still must carry its burden to show that it is entitled to judgment as a matter of law.
*See Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021); *Raymond v. Ameritech Corp.*, 442
F.3d 600, 608 (7th Cir. 2006) ("[A] nonmovant's failure to respond to a summary judgment
motion, or failure to comply with Local Rule 56.1, does not, of course, automatically result in
judgment for the movant.").

So, this Court must view the undisputed facts in Sadig's favor, consider the claims in
light of the undisputed facts, and decide whether there is any genuine need for a trial. With those
standards in mind, the Court turns to the record at hand.

## Background

Between 2005 and 2006, Defendant Bashar Sadig failed to timely file federal income tax
returns. *See* Pl.'s Statement of Facts, at ¶ 2 (Dckt. No. 61-2). By 2008, he learned that he owed
over $40,000 in federal taxes for 2005 and 2006. *Id.* at ¶ 9; Sadig Dep., at 42:8-22 (Dckt. No.
61-5). Sadig knew about the unpaid taxes, but he never paid up.

In 2010, the IRS assessed his federal income tax liabilities for 2005 and 2006.
Specifically, the IRS assessed his tax liabilities at $19,084 for 2005, and $22,625 for 2006. *See*
Pl.'s Statement of Facts, at ¶¶ 1–2 (Dckt. No. 61-2). The Secretary of the Treasury gave Sadig
notice of the tax bill and demanded payment of the outstanding balances that year. *Id.* at ¶ 5.

More unpaid tax liabilities followed. Sadig failed to pay his taxes for 2012 and 2013. *Id.*
at ¶ 1. He received a notice and demand for payment of the outstanding balances, which totaled
about $30,000. *Id.* at ¶¶ 1, 5. As before, Sadig didn't pay what he owed.

Sadig wasn't paying his taxes, but he was paying for home improvements. In 2002,
Sadig and his wife, Defendant Cuu A. Lau, purchased a home at 4 Granville Avenue in Park
Ridge, Illinois. *Id.* at ¶¶ 10, 12. They paid between $275,000 and $280,000 for the property and

were joint tenants. *Id.* at ¶¶ 10–11. The couple shared the mortgage and utility bills. *Id.* at ¶¶ 16, 20.

Soon after they bought the home, Sadig began an extensive remodeling project. *Id.* at ¶ 21. He estimates that he spent about $160,000 on repairs and renovations from 2002 to 2014. *Id.* Sadig would make decisions to renovate the property without input from Lau. *Id.* at ¶¶ 22–25. The couple didn't have a set payment plan for their renovations – both Sadig and Lau contributed to the improvements. *Id.*

Beginning around 2012, Sadig attempted a "total renovation" of the home. *Id.* at ¶ 26. He attempted to add a second floor, and he wanted to improve the "foundation" of the property. *Id.*; *see also* Sadig Dec., at ¶ 7 (Dckt. No. 40).

Sadig's renovations failed, catastrophically. His project compromised the structural integrity of the house. *See* Sadig Dec., at ¶ 8 (Dckt. No. 40). In December 2013, the City of Park Ridge sent him a notice that the residence was "not in compliance with the health and safety code due to structural issues." *See* Pl.'s Statement of Facts, at ¶ 27 (Dckt. No. 61-2). The letter explained that, given its current state, the property may need to be demolished. *See* Sadig Dec., at ¶ 8.

Amidst his home improvement disaster, Sadig's federal tax liabilities caught up with him. In February 2014, the IRS sent him a Notice of Federal Tax Lien ("NFTL"), stating that he owed over $150,000 in unpaid federal taxes.[1] *See* Pl.'s Statement of Facts, at ¶ 29 (Dckt. No. 61-2); Notice of Federal Tax Lien (Dckt. No. 61-21, at 1 of 7). Sadig did not respond.

---

[1] The NFTL included Sadig's unpaid taxes from 2004, which amounted to just over $90,000. *See* Notice of Federal Tax Lien (Dckt. No. 61-21, at 1 of 7). The government does not seek to collect on Sadig's 2004 tax liabilities because they have expired. *See* Pl.'s Statement of Facts, at ¶ 29 (Dckt. No. 61-2).

Three months later, Sadig transferred his interest in the Granville property to Lau. *See* Pl.'s Statement of Facts, at ¶ 30 (Dckt. No. 61-2). He signed a quitclaim deed conveying his interest to his wife on May 16, 2014. *Id.*; *see also* Quitclaim Deed (Dckt. No. 61-14). Sadig simply gave the property to Lau. *See* Pl.'s Statement of Facts, at ¶¶ 32–33, 35–37, 40. The quitclaim deed includes a stamp indicating that any consideration for the property was less than $100 (if there was any at all). *Id.* at ¶ 34; *see also* Quitclaim Deed, at 1.

Apparently, Sadig felt frustrated and responsible for the state of the Granville property. *See* Pl.'s Statement of Facts, at ¶ 38 (Dckt. No. 61-2). He transferred his interest to Lau to make amends for the home's disrepair. *Id.* He was fed up, and he wanted to move on. *Id.* In Sadig's words, "the lot was messed up because of what I did . . . and I left it and said hell with it. Literally that was the intensity of those moments of my life." *See* Sadig Dep., at 118:9-10 (Dckt. No. 61-5).

The Granville home was not long for this world. In June 2014, one month after transferring his interest to his wife, the Granville house was demolished. *See* Pl.'s Statement of Facts, at ¶¶ 28–29 (Dckt. No. 61-2). The property is now a vacant lot. *Id.* at ¶ 28; *see also* Lau Dep., at 70:3-6 (Dckt. No. 61-6) ("And I mean the house was there, and then the moment you see it, it disappeared. It was empty land. And then after that nothing happened.").

After the transfer of the Granville property, Sadig had empty pockets. He had no ownership interest in any real property, and no ownership interest in any personal property worth more than $5,000. *See* Pl.'s Statement of Facts, at ¶¶ 45–46 (Dckt. No. 61-2). He was left with only his car, a 2002 Volkswagen Jetta valued at $500. *Id.* at ¶ 45.

Lau wasn't oblivious to Sadig's position, either. According to her deposition, "I believe that he lost all the money that he put into the construction of the house. And I don't think he had

a job at that time. And so basically the house was gone, I mean destroyed, with an empty, ruined property. And all the money was gone. So that's what happened." *See* Lau Dep., at 79:12-18 (Dckt. No. 61-6).

The home was gone, and the marriage soon followed. In October 2016, Sadig petitioned for dissolution of his marriage with Lau. *See* Pl.'s Statement of Facts, at ¶ 48 (Dckt. No. 61-2). In July 2018, their marriage officially dissolved. *Id.* at ¶ 51. During the dissolution, Sadig and Lau did not transfer property to each other. *Id.* at ¶ 52.

In September 2018, Lau entered into a Trust Agreement with Defendant ATG Trust Company. *Id.* at ¶ 53; *see also* Trust Agreement (Dckt. No. 61-18). Lau conveyed her interest in the Granville property to the trust. *See* Pl.'s Statement of Facts, at ¶ 57 (Dckt. No. 61-2); Warranty Deed In Trust (Dckt. No. 61-20). ATG Trust did not provide anything of value in exchange for the transfer of her interest in the property. *See* Pl.'s Statement of Facts, at ¶ 59.

As a result, ATG Trust currently holds title to the Granville property. *Id.* at ¶ 58. Lau is the sole beneficiary and holder of the power of direction of the trust during her lifetime. *Id.* at ¶ 60. So the Granville property remains in Lau's ownership and control (albeit through the trust). Lau considers the property to be hers, and she continues to pay property taxes on the lot. *Id.* at ¶ 61.

The Trust Agreement names Sadig as the sole beneficiary of the trust in the event of Lau's death. *Id.* at ¶¶ 55–56.

As of September 2021, Sadig remains on the hook for $98,450.18 in federal tax liabilities. *Id.* at ¶ 7. That amount includes Sadig's liabilities for 2005 ($24,847.42), 2006 ($27,720.34), 2012 ($6,805.66), and 2013 ($39,076.76). *Id.* Those figures take into account all abatements, payments, and credits, as well as assessed and accrued late-filing penalties, late

payment penalties, failure to make estimated tax payments penalties, costs, and statutory interest. *Id.* at ¶¶ 7–8. Statutory interest continues to accrue. *Id.* at ¶ 8.

On March 24, 2020, the United States filed a complaint against Sadig to collect the unpaid tax liabilities, and later filed an amended complaint. *See* Cplt. (Dckt. No. 1); Am. Cplt. (Dckt. No. 4). The government seeks to reduce Sadig's federal tax liabilities to judgment and to enforce tax liens on the Granville property based on Sadig's unpaid taxes for 2005, 2006, 2012, and 2013.

After discovery, the government moved for summary judgment. *See* Pl.'s Mtn. for Summ. J. (Dckt. No. 61).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l*

9

*Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The amended complaint includes two claims. *See* Am. Cplt. (Dckt. No. 4). The first claim is against Sadig (only), and the second claim is against Sadig, Lau, ATG Trust Company, and Cook County (the government included Cook County to give notice in case there is a local tax lien, too).

In Count I, the government seeks to reduce Sadig's federal tax liabilities to judgment. *Id.* at ¶¶ 9–11. In Count II, the government seeks to enforce the government's federal tax liens on the Granville property. *Id.* at ¶¶ 12–27.

The government moved for summary judgment on each claim, so the Court will address them in that order.

## I. Sadig's Tax Liabilities

"[T]axes are the lifeblood of government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1935). To that end, the IRS has an ongoing obligation to "make the inquiries, determinations, and assessments of all taxes . . . which have not been duly paid." *See* 26 U.S.C. § 6201(a). And the IRS may base its assessments of unpaid taxes on its own "reasonable" estimations. *See United States v. Fior D'Italia, Inc.*, 536 U.S 238, 243 (2002).

A tax assessment is simply "the formal recording of a taxpayer's tax liability." *See Our Country Home Enters., Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 778 (7th Cir. 2017)

(citing I.R.C. § 6203); *see also Hibbs v. Winn*, 542 U.S. 88, 89 (2004) ("[A]n assessment is closely tied to the collection of a tax, *i.e.*, the assessment is the official recording of liability that triggers levy and collection efforts."). Importantly, "'[t]he assessment is given the force of a judgment,' authorizing the IRS to collect the tax." *See Our Country Home*, 855 F.3d at 778 (quoting *Bull*, 295 U.S. at 260).

Courts presume that IRS assessments of tax liability are correct, and that presumption "can help the Government prove its case against a taxpayer in court." *See Fior D'Italia, Inc.*, 536 U.S. at 242. Indeed, "courts will not look behind an assessment to evaluate the procedure and evidence used," so long as the assessment is not shown to be "without rational foundation or arbitrary and erroneous." *See Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir. 1987). The presumption also may be overcome "by a showing that the assessment was computed in an incorrect manner." *United States v. Schroeder*, 900 F.2d 1144, 1147 (7th Cir. 1990).

The IRS records its assessments on Forms 4340, which "establish the fact of assessment and carry with them a presumption of validity and that the assessments they reflect were properly made." *See Hefti v. IRS*, 8 F.3d 1169, 1172 (7th Cir. 1993); *see also United States v. Braithwaite*, 2017 WL 2793801, at *2 (N.D. Ill. 2017) ("[I]t is well established in tax law that an assessment is entitled to a presumption of legal correctness.") (citing *Fior D'Italia, Inc.*, 536 U.S. at 242); *Gen. Star Indemn. Co. v. Hubbard Bowling Lanes, Inc.*, 2003 WL 22048740, at *2 (N.D. Ill. 2003) ("Federal tax assessments are presumptively correct.").

Here, the government submitted three sets of documents to substantiate Sadig's federal tax liabilities: (1) IRS Form 4340s showing assessments for the tax periods ending in 2005,

2006, 2012, and 2013; (2) so-called "INTST"[2] reports from the Information Data Retrieval System for 2005, 2006, 2012, and 2013; and (3) a declaration of Larita A. Minor, an IRS Revenue Officer Advisor.

According to assessments as reflected on the Form 4340s, Sadig owed $19,084 in 2005, $22,625 in 2006, $8,421 in 2012, and $21,974 in 2013. *See* 2005 Form 4340 (Dckt. No. 61-3, at 6 of 34); 2006 Form 4340 (Dckt. No. 61-3, at 14 of 34); 2012 Form 4340 (Dckt. No. 61-3, at 22 of 34); 2013 Form 4340 (Dckt. No. 61-3, at 27 of 34). The IRS Revenue Officer Advisor confirmed the accuracy of the numbers. *See* Minor Dec., at ¶¶ 5, 9 (Dckt. No. 61-3, at 2–3 of 34). They add up to $72,104.

The assessments took place at different times. The IRS assessed Sadig's liabilities for 2005 and 2006 in March 2010. *Id.* at ¶ 5. It assessed his liabilities for 2012 in June 2013. *Id.* And it assessed his liabilities for 2013 in July 2014. *Id.*

But assessments do not necessarily tell the full story when it comes to current tax liabilities. Tax liabilities can go up (because of late fees, penalties, interest, and so on), and they can go down (because of payments, and so on). Here, Sadig apparently made a few payments over the years. *See* Pl.'s Statement of Facts, at ¶ 7 (Dckt. No. 61-2); Minor Dec., at ¶ 15 (Dckt. No. 61-3, at 4 of 34). So, to tell the full story, the government needed to do more than come forward with the numbers from the assessments in the Form 4340s.

---

[2] The government never explains what "INTST" stands for, leaving the Court stranded in Acronym-ville. But based on this Court's search, it appears that the term refers to a computer program for calculating liabilities. *See Kay v. IRS*, 1998 WL 681432, at *2 (C.D. Cal. 1998) ("INTST is an internal IRS interest and penalty computation program. It shows the amount of taxes and tax penalties and interest due from or owing to the taxpayer with respect to a tax account as of a specific date, based upon both posted and pending transactions.").

To fill in the missing pieces, the government submitted four INTST reports covering 2005, 2006, 2012, and 2013.  Those reports reflect the IRS's initial tax assessments of Sadig's liabilities, plus penalties, interest, statutory additions, payments, credits, abatements, and accruals.  *See* Pl.'s Statement of Facts, at ¶ 7 (Dckt. No. 61-2).  Once again, the IRS Revenue Officer Advisor confirmed the numbers.  *See* Minor Dec., at ¶ 14 (Dckt. No. 61-3, at 4–5 of 34).

According to the INTST reports as of September 2021, Sadig owed $24,847.42 for 2005, $27,720.34 for 2006, $6,805.66 for 2012, and $39,076.76 for 2013.  *See* 2005 INTST Report (Dckt. No. 61-3, at 31 of 34); 2006 INTST Report (Dckt. No. 61-3, at 32 of 34); 2012 INTST Report (Dckt. No. 61-3, at 33 of 34); 2013 INTST Report (Dckt. No. 61-3, at 34 of 34).  Adding them up, Sadig faces $98,450.18 in unpaid federal taxes.  *See* Pl.'s Statement of Facts, at ¶ 7 (Dckt. No. 61-2); Minor Dec., at ¶ 14 (Dckt. No. 61-3, at 4 of 34).

The process seems complex, but the punchline is simple:  Sadig owes the federal government almost $100,000 in unpaid taxes.  Again, courts generally do not "look behind an assessment to evaluate the procedure and evidence used in making the assessment."  *Ruth*, 823 F.2d at 1093.  Those assessments (*i.e.*, the Form 4340s) receive a presumption of validity.  *See Hefti*, 8 F.3d at 1172; *Braithwaite*, 2017 WL 2793801, at *2.  The same presumption applies to INTST Reports.  *See, e.g.*, *United States v. Chase*, 2021 WL 3508092, at *7 n.19 (M.D. Fla. 2021); *United States v. Seeley*, 2018 WL 5845214, at *3 (D. Mass. 2018); *United States v. Sanchez-Martinez*, 2012 WL 1825325, at *2 (E.D.N.C. 2012).

In his response, Sadig does not challenge the "tax principal amounts."  *See* Def.'s Resp., at 3 (Dckt. No. 63).  Instead, he makes a smattering of equitable arguments.  He points to the COVID-19 pandemic, his personal health problems, and the 2008 recession, offering them as a "basis for offsetting the excessive interest rates incurred as per the assumed tax liabilities."  *Id.* at

13

2. He also contends that his failed renovations on the Granville property should offset "the tax principles at least for tax year 2012 and tax year 2013 (at the time of escalating the house construction activities)." *Id.* at 3.

The Court fully appreciates that Sadig may have faced a number of significant challenges in his personal life. But people with problems must pay their taxes, too. Sadig does not offer this Court any authority for the notion that district courts enjoy discretion to reduce the interest rates on unpaid taxes, or to revisit whether a tax bill is appropriate, based on personal considerations. If anything, the law flows in the opposite direction. *See United States v. Braithwaite*, 2017 WL 2793801, at *3 (N.D. Ill. 2017) ("[A]ccepting [defendants'] (poorly developed) argument now would amount to a refusal to allow the IRS to obtain the taxes to which it is legally entitled – a request that is fundamentally beyond the Court's power.") (citing 26 U.S.C. § 7421); *see also* 26 U.S.C. § 7421 ("[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ."). The government's assessment of tax liabilities is entitled to a presumption of correctness, and Sadig has not come forward with anything to undermine that presumption.[3]

Accordingly, Sadig owes $98,450.18 in unpaid federal tax liabilities as of September 8, 2021, the date offered in the government's submission.

---

[3] Sadig also submitted an "Intent to File Response" after he had already filed his response brief. *See* Intent to File Resp. (Dckt. No. 70). He then filed a sur-response without waiting for the Court's ruling. *See* Def.'s Sur-Resp. (Dckt. No. 71). The sur-response repeats his original response: Sadig feels "remorseful of the situation and overwhelming burdens he may have exerted on many," and he requests leniency based on the COVID-19 pandemic, his personal health problems, and the 2008 recession. *Id.* at 2, 9–10. Despite filing his sur-response without the Court's permission, the Court has nevertheless considered the sur-response in making this ruling. The equitable arguments don't move the needle.

## II.     Federal Tax Liens on the Granville Property

The next question is whether the IRS can collect the amount owed through a forced sale of the Granville property.  The government contends that federal tax liens attached to the Granville property.  The government also contends that the tax liens survived the later transfer of Sadig's interest to his wife (Lau), and Lau's later transfer of ownership to the trust.  The Court agrees.

A federal tax liability gives rise to a federal tax lien.  When a tax(non)payer fails to pay a tax liability on demand, "the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  *See* 26 U.S.C. § 6321.

Notice the sweep of the text – the statute covers "all property and rights to property," full stop.  *Id.*  The statute "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have."  *United States v. Nat'l Bank of Com.*, 472 U.S. 713, 719–20 (1985); *see also Glass City Bank v. United States*, 326 U.S. 265, 267 (1945) ("Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes.").

A federal tax lien attaches "at the time the tax assessment is made, and it continues until the liability has been satisfied or it becomes unenforceable due to the lapse of time."  *See United States v. Librizzi*, 108 F.3d 136, 137 (7th Cir. 1997) (citing 26 U.S.C. § 6322).  Once attached, "the lien cannot be extinguished (assuming proper filing and the like) simply by a transfer or conveyance of the interest."  *Id.* (quoting *United States v. Rodgers*, 461 U.S. 677, 691 n.16 (1983)).  The property and the lien are fused together, and the lien goes wherever the property goes.

Sorting out the existence of a lien requires a look at state and federal law. Whether a certain interest in real property falls under section 6321 "is a matter of federal law." *Drye v. United States*, 528 U.S. 49, 58 (1999) (cleaned up). Courts "look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Id.* In other words, "State law determines which sticks are in a person's bundle, but federal law determines whether those sticks constitute property for federal tax lien purposes." *See United States v. Craft*, 535 U.S. 274, 274 (2002).

Sadig and Lau purchased the Granville property as joint tenants in 2002. *See* Pl.'s Statement of Facts, at ¶¶ 10–12 (Dckt. No. 61-2). Under Illinois law, a joint tenancy consists of "the four unities which are fundamental to both the creation and the perpetuation of the joint tenancy. These are the unities of interest, title, time, and possession." *See Harms v. Sprague*, 105 Ill. 2d 215, 85 Ill. Dec. 331, 473 N.E.2d 930, 932 (1984). A joint tenancy exists as "a present estate in all the joint tenants, with each joint tenant being seized of the whole." *See Stone v. United States*, 2014 WL 1289788, at *9 (N.D. Ill. 2014) (quoting *Snyder v. Heidelberger*, 2011 IL 111052, 352 Ill. Dec. 176, 953 N.E.2d 415, 420 (Ill.)).

In May 2014, Sadig purportedly conveyed his interest in the Granville property to Lau by quitclaim deed. If the conveyance was valid, it would have severed the joint tenancy. *See Harms*, 473 N.E.2d at 932.

The government argues that federal tax liens attached to the Granville property for Sadig's tax liabilities for 2005, 2006, 2012, and 2013. And the government argues that the liens attached before Sadig gave up his interest in the property in May 2014.

16

The Court will discuss the tax liabilities in two different groups. The tax liabilities for 2005, 2006, and 2012 arose long before the conveyance in May 2014, so the Court will address those liabilities first.

The liability for 2013 is a closer call, from a chronological perspective. Sadig owed his 2013 taxes as of April 15, 2014 – tax day. Sadig transferred his interest to his wife on May 16, 2014. *See* Quitclaim Deed (Dckt. No. 61-14). And the IRS assessed his 2013 tax liabilities on July 14, 2014. *See* Minor Dec., at ¶ 5 (Dckt. No. 61-3, at 2 of 34).

For the sake of simplicity, the Court will address the existence of a lien for the 2005, 2006, and 2012 tax liabilities first, and then will address the existence of a lien for 2013.

## A.  Tax Liens for 2005, 2006, and 2012

The government assessed Sadig's tax liabilities for 2005, 2006, and 2012 long before he surrendered his ownership interest in the Granville property. Again, the IRS assessed Sadig's tax liabilities for 2005 and 2006 in March 2010. *Id.* And it assessed his 2012 tax liabilities in June 2013. *Id.* At that time, the government mailed notice and demand letters to Sadig's last known address. *Id.* at ¶ 10.

The assessments for the 2005, 2006, and 2012 tax liabilities took place by June 2013, long before Sadig signed the quitclaim deed in May 2014. So the liens attached to the Granville property before Sadig gave it up. *See Librizzi*, 108 F.3d at 137 ("Federal tax liens attach 'at the time the tax assessment is made . . . .'") (quoting 26 U.S.C. § 6322). Sadig's conveyance of his interest in the Granville property to Lau in 2014 did not affect the validity of the preexisting liens. *Id.*; *Wilmington*, 2022 WL 160286, at *3.

Sadig couldn't convey his interest free and clear, because he didn't own the Granville property free and clear. He owned an interest in that property subject to federal tax liens. The

liens were tethered to the property. So, when Sadig transferred the property, the liens went along for the ride.

In sum, tax liens existed on the Granville property for Sadig's federal tax liabilities for 2005, 2006, and 2012. The subsequent transfer of that property did not eliminate the existence of the liens. Basically, Sadig transferred an interest that was encumbered by federal tax liens.

### B.    Tax Lien for 2013

The chronology for the 2013 tax year is a little more complicated, but the end result is the same. There is a tax lien on the Granville property for Sadig's 2013 tax liabilities, too.

Unlike the assessment for the 2005, 2006, and 2012 tax years, the IRS assessed Sadig's 2013 liabilities *after* he conveyed his interest in the Granville property to Lau. Sadig signed the quitclaim deed and conveyed his interest to his wife on May 16, 2014. *See* Pl.'s Statement of Facts, at ¶ 30 (Dckt. No. 61-2); Quitclaim Deed (Dckt. No. 61-14). The IRS assessed his 2013 liabilities on July 14, 2014, two months later. *See* Minor Dec., at ¶ 5 (Dckt. No. 61-3, at 2 of 34). The IRS mailed an automatic notice and demand letter to Sadig at the time of the assessment. *Id.* at ¶ 10.

So Sadig conveyed his interest in the Granville property in May 2014, two months before the IRS assessed his 2013 tax liabilities in July 2014. The question is whether a federal tax lien attached to the property, even though the taxpayer transferred the property before the assessment.

A debtor's transfer of property does not necessarily remove the property beyond the grasp of a creditor. The Illinois Uniform Fraudulent Transfer Act ("IUFTA") prevents the "fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *See Zurich Am. Ins. Co. v. Personnel Staffing Grp., LLC*, 2018 IL App (1st) 172281, 423 Ill. Dec. 571, 105 N.E.3d 979, 984 (2018) (citation omitted). Under the IUFTA, a

creditor may seek to avoid a "transfer or obligation to the extent necessary to satisfy the creditor's claim." *See* 740 ILCS § 160/8(a)(1).

The IUFTA defines a "creditor" as "a person who has a claim," and a "debtor" as a person "who is liable on a claim." *See* 740 ILCS § 160/2(d), (f). A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at § 160/2(c). For any action under the IUFTA, the plaintiff must establish a creditor-debtor relationship. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 383 (7th Cir. 2008).

The IUFTA prohibits two types of fraud: actual fraud (*i.e.*, fraud in fact) and constructive fraud (*i.e.*, fraud in law). *See* 740 ILCS § 160/5(a)(1)–(2); 740 ILCS § 160/6(a); *Centerpoint Energy Servs., Inc. v. Halim*, 743 F.3d 503, 506 (7th Cir. 2014). Actual fraud requires a showing of "actual intent to hinder, delay, or defraud any creditor of the debtor." *See* 740 ILCS § 160/5(a)(1). The government does not pursue a theory of actual fraud against Sadig.

Constructive fraud, on the other hand, does not require fraudulent intent. Constructive fraud occurs "when the debtor makes a transfer without receiving a reasonably equivalent value in exchange; there is an existing or contemplated debt against him; and he does not retain sufficient property to pay that debt." *See Malek v. Malek*, 2020 WL 6075871, at *3 (N.D. Ill. 2020) (citing *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078–79 (7th Cir. 1997)). The concept is the flipside of "you can't get something for nothing."

Under the statute, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent

19

value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *See* 740 ILCS § 160/6(a). In other words, a transfer is constructively fraudulent if: (1) it arose after a creditor's claim; (2) the debtor did not receive reasonably equivalent value for the transfer; and (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of it. *Id.*; *see also Malek*, 2020 WL 6075871, at *3.[4]

For fraudulent conveyance purposes, the IRS had a claim when the taxes were due, not when the assessment took place. "Courts facing this issue in this district have found that for fraudulent conveyance purposes, the United States is a creditor as to any unpaid tax liabilities *prior* to the issuance of an assessment." *See United States v. Brickman*, 906 F. Supp. 1164, 1172 (N.D. Ill. 1995) (emphasis added) (collecting cases). Instead of the date of assessment, tax liabilities "become due and owing on the date the tax returns are required to be filed." *Id.*

As Americans know all too well, tax returns are due on April 15 following the close of the calendar year. *See* 26 U.S.C.A. § 6072(a). Tax liabilities for Year 1 are due on April 15 of Year 2. At that point, the taxpayer is a debtor, and the government is the creditor.

So Sadig's 2013 tax liabilities accrued in April 2014, not when the IRS assessed his liabilities two months later. Accordingly, a creditor-debtor relationship for the 2013 tax liabilities arose between the government and Sadig in April 2014, one month *before* he signed the quitclaim deed in May 2014.

Based on the undisputed facts, Sadig's conveyance of his interest in the Granville property to Lau satisfies all three elements of constructive fraud under section 6(a) of the

---

[4] The Fraudulent Transfer Act prohibits two types of constructive fraud, under § 160/5(a)(2) and § 160/6(a). The elements are similar, but not exactly the same. *See Malek v. Malek*, 2020 WL 6075871, at *3 (N.D. Ill. 2020). The government here relies on the constructive fraud provision appearing in section 6(a) of the statute.

IUFTA. First, the government became a creditor before Sadig transferred the property. Sadig owed his 2013 taxes to the government by April 15, 2014. He signed the quitclaim deed in May 2014, one month later.

Second, Sadig did not receive anything of value in return for the conveyance of his property interest. Sadig gave the property to Lau for no consideration, as Lau acknowledged. *See* Lau Resp. to Pl.'s Interrogatories, at ¶ 1(b)(i) (Dckt. No. 61-19). Sadig also admits that he "gave her the house" based on "no financial exchange." *See* Sadig Resp. to Pl.'s Interrogatories, at ¶¶ 2(a)(i)-(ii) (Dckt. No. 61-7). Similarly, his response never mentions receiving consideration for the transfer. *See* Def.'s Resp., at 3 (Dckt. No. 63).

Sadig transferred something for nothing. Without consideration, Sadig could not have received anything of value in return for his attempted transfer. *See Indep. Tr. Corp. v. Fid. Nat. Title Ins. Co.*, 577 F. Supp. 2d 1023, 1043 (N.D. Ill. 2008) ("A transfer is not made for 'reasonably equivalent value' when the transferee gives no consideration, or too little consideration, for the assets received.") (citation omitted).

Third, Sadig was insolvent at the time of his attempted transfer, or he became insolvent because of the conveyance. A debtor becomes insolvent if the sum of his debts exceeds his assets at a fair valuation. *See* 740 ILCS § 160/3(a). After his transfer, Sadig had no ownership in anything and only possessed his $500 Volkswagen Jetta. At the same time, his tax liabilities surpassed $150,000.[5] *See* Notice of Federal Tax Lien (Dckt. No. 61-21, at 1 of 7). His debts in May 2014 exceeded his assets by a wide margin.

---

[5] Sadig received the NFTL describing his tax liabilities in February 2014, and he transferred his interest in the Granville property in May 2014. The NFTL lists an unpaid balance of over $150,000 because it accounted for Sadig's 2004 liabilities (over $90,000). *See* Notice of Federal Tax Lien (Dckt. No. 61-21, at 1 of 7). While the government does not seek to enforce Sadig's 2004 tax liabilities in this action because they have expired, Sadig still owed that amount in 2014. The Court therefore includes Sadig's 2004 tax liabilities in determining his insolvency in May 2014.

Based on the undisputed facts, Sadig's transfer of his interest in the Granville property was constructively fraudulent, and thus may be avoided. In sum, the government has a federal tax lien on the Granville property for Sadig's 2013 federal tax liabilities, and that lien survived Sadig's attempt to transfer the property.

### C.     Lau's Transfer to ATG Trust

There is one more wrinkle. The Granville property did not stay in Lau's hands. She transferred ownership of that property to ATG Trust. The question is whether Lau's transfer of ownership into a trust interferes with the government's ability to enforce a federal tax lien.

The government argues that ATG Trust holds title to the property as Lau's nominee. The Court agrees. So the transfer of Lau's interest to the trust is not an impenetrable barrier. Truth be told, the trust is simply Lau's nominee.

But before diving in, at the end of the day, it does not matter much whether the trust was Lau's nominee. The purported transfer from Sadig to Lau was constructively fraudulent, and is avoided. As a result, the signing of the quitclaim deed was a nullity, and Sadig and Lau continued to own the Granville property. So, it does not matter whether Lau or the trust owns the *other* half of the property. The key point is that *Sadig* continues to own an interest in the property, despite the purported transfer to Lau.[6]

A nominee is someone who holds legal title for the benefit of another person. *See United States v. Swan*, 467 F.3d 655, 658 (7th Cir. 2006). An entity qualifies as a taxpayer's nominee when "the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of [that entity] while actually retaining some or all of the benefits of true ownership." *See Stone v.*

---

[6] That said, the later transfer of Lau's interest to the trust may have converted the interest of Sadig and Lau from a joint tenancy to a tenancy in common. *See Sathoff v. Sutterer*, 373 Ill. App. 3d 795, 311 Ill. Dec. 680, 869 N.E.2d 354, 356–57 (2007).

*United States*, 2014 WL 1289788, at *9 (N.D. Ill. 2014) (citation omitted). "Because the nominee does not hold a valid ownership interest in the property, a creditor of the property's true owner can recover against it – even though the true owner is not the legal title holder." *United States v. Maier*, 2019 WL 1399983, at *8 (N.D. Ill. 2019) (citing *Swan*, 467 F.3d at 658); *see also United States v. Wesselman*, 406 Fed. App'x 64, 65 (7th Cir. 2010) ("The lien that arises after a taxpayer fails to pay an assessed tax liability attaches not only to property belonging to the taxpayer, but also to property held by the taxpayer's nominees – someone who has legal title when, in substance, the taxpayer enjoys the benefits of ownership.").

Illinois courts have not addressed the nominee theory, so federal courts use a multi-factor standard to determine whether an entity is a nominee. *See Maier*, 2019 WL 1399983, at *8; *Stone*, 2014 WL 1289788, at *9 (collecting cases). Those factors include whether: "(1) there is a close personal relationship between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and, (5) the transferor continues to exercise dominion and control over the property." *See United States v. Szaflarski*, 614 F. App'x 836, 838 (7th Cir. 2015). In the specific context of trusts, courts also look to the identity of the sole beneficiary. *See United States v. Sanders*, 676 F. App'x 599, 600 (7th Cir. 2017).

A few of the considerations don't come into play, such as the existence of a close personal relationship between the nominee and the transferor. (Here, the trust is an entity, so it has no personal relationships.) There isn't anything in the record about why Lau placed the property in a trust. But several other factors weigh heavily in support of the conclusion that

ATG Trust is holding the property for Lau. Based on the undisputed facts, the trust is simply a nominee.

First, ATG Trust paid nothing for the property. *See* Pl.'s Statement of Facts, at ¶ 59 (Dckt. No. 61-2). Lau paid $190 to create the trust and pays ATG Trust $95 annually to hold title to the property. *See* Trust Agreement, at 3 (Dckt. No. 61-18). So, ATG received title to the property, and is getting paid to own it. The trust is simply holding the property, for the benefit of Lau.

Second, under the Trust Agreement, Lau has dominion and control. Lau maintains the sole power to possess, manage, and physically control the Granville property. *Id.* at 1–2. She receives any income generated by the property. *Id.* She directs ATG Trust as trustee in dealing with title to the property, and receive proceeds from the sale of the property made under the power of direction during her lifetime. *Id.*

Third, the Trust Agreement identifies Lau as the sole beneficiary of the trust during her lifetime, and Sadig as the sole beneficiary in the event of Lau's death. *Id.* at 2.

All of those facts support the conclusion that ATG Trust is a nominee, and there are no material facts on the other side of the ledger. Based on the undisputed facts, ATG Trust is Lau's nominee. As a result, the transfer of the property to the trust does not close the door on the enforcement of the federal tax liens.

### III. Sale of the Granville Property

A federal tax lien is not "self-executing." *See Wilmington Sav. Fund Soc'y, FSB v. Cosmano*, 2022 WL 160286, at *4 (N.D. Ill. 2022) (citing *Nat'l Bank of Com.*, 472 U.S. at 720). Instead, the Internal Revenue Code provides the government with a right of action to enforce its liens. *See* 26 U.S.C. § 7403(a); *United States v. Adent*, 821 F.3d 911, 914 (7th Cir. 2016). The

government relies on the Code to enforce its liens on the Granville property. *See* Am. Cplt., at ¶ 27 (Dckt. No. 4).

The Court may order the forced sale of property to enforce a federal tax lien. The Internal Revenue Code provides that, in all lien-enforcement cases involving a claim or interest of the United States, a court "may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States." *See* 26 U.S.C. § 7403(c).

Notice the use of "may" in section 7403. A court *may* decree a sale of such property. When the subject property implicates innocent third-party interests, a court can exercise its discretion to deny the forced sale of the property. *See United States v. Rodgers*, 461 U.S. 677, 703–05 (1983). That said, a district court has "limited discretion" under section 7403, which must be "exercised rigorously and sparingly, keeping in mind the Government's paramount interest in prompt and certain collection of delinquent taxes." *Id.* at 711.

In accounting for innocent third-party interests during forced property sales, courts look to four non-exhaustive factors: "(1) the prejudice to the government's interest as the result of a partial, rather than a total, sale; (2) whether the third party with a non-liable separate interest in the property would, in the normal course of events have a legally recognized expectation that that separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors; (3) the prejudice to the third party as the result of a total sale; and (4) the relative character and value of the non-liable and liable interests held in the property." *Adent*, 821 F.3d at 915 (cleaned up) (citing *Rodgers*, 461 U.S. at 710–11).

25

Here, Lau had an innocent half-ownership interest in the Granville property, but the factors weigh in favor of the government's request for a forced sale. Based on the undisputed facts, a forced sale is appropriate.

First, a partial sale of the Granville property is not a viable or practical option. Second, Lau has no "legally recognized expectation" that her interest would not be subject to a forced sale due to Sadig's delinquency. *See Adent*, 821 F.3d at 916 ("Derek, the non-delinquent co-owner of Parcel B, has no 'legally recognized expectation' that his interest would not be subject to a forced sale due to Leonard's delinquency."). Third, Lau does not reside on the Granville property and would not be dislocated (it is an empty lot). Fourth, the "relative character and value of the non-liable and liable interests" does not weigh in any party's interest. *Id.* at 915. Lau's innocent interest in the Granville property does not outweigh the government's "paramount" interest in collecting Sadig's tax delinquencies.

The government can file a motion if it seeks the appointment of a receiver. *See* 26 U.S.C. § 7403(d) ("[A]t the instance of the United States, the court may appoint a receiver to enforce the lien . . ."). In requesting the appointment of a receiver under section 7403(d), "the Government needs only to make a prima facie showing that a substantial tax liability probably exists and that the Government's collection efforts may be jeopardized if a receiver is not appointed." *See Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994). If the government seeks a different form of relief (*e.g.*, public auction of the property), it may make such a request.

## Conclusion

For the foregoing reasons, the government's motion for summary judgment is granted.

Date:   June 30, 2022

_____

Steven C. Seeger
United States District Judge

27